## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### AKERS V. AKERS AND ALS. ·

#### JUNE 30th, 1887.

PRACTICE IN CHANCERY—*Rehearing—After-discovered evidence.*—Where the after-discovered evidence, whenever a decree is sought to be reheard, is merely cumulative and not variant from the evidence already in the record, it is the settled doctrine that no rehearing will be allowed.

Appeal from decree of circuit court of Franklin county, rendered July 4th, 1885, in a chancery suit wherein Madison J. Akers was complainant, and Nathaniel S. Akers and others were defendants. The object of the suit was to procure a rehearing of a previous decree in the same cause, with a view to obtain allowance of credits on N. S. Akers' claim against the appellant to those which had been allowed him by the decree prayed to be reheard, upon the ground of after-discovered evidence. ·Opinion states the case.

*Charles Dabney,* for the appellant.

*Geo. E. Dennis* and *Peter Dillard,* for the appellees.

HINTON, J., delivered the opinion of the court.

The only question of practical importance remaining in this case is whether the appellant, Madison J. Akers, should

be allowed a credit of $370 as of February, 1859, in the account taken of the transactions between himself and his brother, Nathaniel S. Akers. That question arises in this way: In the year 1857, their father, Samuel Akers, died, and soon thereafter a chancery suit was brought in the county court of Franklin county, the object of which was to have dower assigned the widow, and to have the residue of the estate, which consisted of land and negroes, partitioned and distributed among his heirs.

At a sale of the negroes had in this cause, on the twenty-first of December, 1857, Nathaniel S. Akers purchased two of them, and in payment gave his bond for $1,200, payable six months after that date. And to a part of that sum, to-wit, the sum of $370, it is not denied that Madison J. Akers was entitled at that time.

On the fourteenth February, 1859, the appellant, by verbal contract, bought of Nathaniel a tract of land containing twenty-six acres, which had fallen to him in the division of his father's estate, for which the said Madison agreed to pay $800—one-half thereof in cash, and the balance on twelve months' time; and it seems to have been agreed between them that any outstanding matters of account might be brought into the final settlement, whenever it was had. By reason, however, of disputes that arose between them as to the various items of credit claimed by the appellant, no settlement was ever reached, and in September, 1882, Nathaniel filed his bill in the circuit court of Franklin county to have his vendor's lien for the unpaid portion of the purchase-money enforced. In his bill he alleged that there remained due at that date the sum of $635.27, as appeared from a statement which he filed with his bill. He also filed with his bill a duly executed deed for said land, to be delivered to the appellant upon the payment of the aforesaid balance; and he called upon the appellant to answer his bill. The appel-

lant did answer, admitting the purchase and possession of the land, but claiming that he only owed a balance of purchase-money of $78.71. With his answer he filed a statement, which, he says, correctly sets forth the payments or credits to which he is entitled on said purchase, and this statement shows the above balance to be due Nathaniel as of January 9th, 1883; and this amount he avers his readiness to pay upon the complainant's making him a good title and stopping the suit. In this answer no allusion is made to any such claim as the one now asserted. By a decree rendered on thirty-first October, 1882, the cause was referred to a commissioner to take the necessary accounts and to report the balance due, and on the twentieth April, 1883, Commissioner Saunders returned his report, presenting alternative statements of the amounts due. By one of these the balance due as of April 28th, 1883, was $79.73, but this statement allowed the appellant all credits claimed by him. The other statement, which only allowed such credits as were not disputed, showed the balance to be $458.90. With his report the commissioner returned all the evidence taken by him.

The cause came on to be heard on the thirty-first October, 1883, when the court, without passing on the report, recommitted the matter to Commissioner Carper, with instructions to take the same account, and, in making up his report, to consider the depositions already filed, or any other legal testimony which might be adduced by any of the parties.

On the nineteenth April, 1884, Commissioner Carper returned his report, in which he states that no additional testimony was offered by either party, and, therefore, he had only considered the testimony taken by Commissioner Saunders, and he finds the balance due by the appellant as of that date to be $611.54.

To this report the appellant filed exceptions, but the

court, overruling all except one, decreed that unless the appellant should pay the appellee, within sixty days, the sum reported by the commissioner, to-wit, $611.54, less certain small credits mentioned in the decree, and his costs, the land should be sold.

To this decree the appellant obtained from the judge of the corporation court of Roanoke an injunction, on a bill alleging that he had informed his counsel and Commissioner Saunders that he was entitled to a credit of $370, with interest for a number of years, on account of his interest in the money which N. S. Akers bound himself to pay for the slaves, and which interest he had allowed said N. S. Akers to retain as a part of the purchase price of the land, as he insisted the proceedings in the suit in the county court for the division of his father's estate would show; and alleging, further, that he had only discovered that this credit had never been allowed him since the adjournment of the April term, 1884, of the circuit court of Franklin county.

To this bill Nathaniel S. Akers filed an answer, in which, after admitting the sale of the land in February, 1859, to Madison J Akers, and the purchase of the slaves by himself for $1,200, and that he had bought the interest of said Madison in the said bond for $1,200, which interest he says amounts to $370, he denies positively that he had endeavored to pay the said interest of Madison J. Akers in the negro money by giving him a credit therefor on his land purchase, or that the same was ever done; and, on the contrary, he charges that he had purchased the interest of the said Madison in the negro money, and paid him for it in full *prior* to the sale of the said land to him, and that said Madison received this negro money on January 1, 1859, as is shown by the credit therefor on the bond which he files with his answer; which credit, he says, was placed upon the bond by A. J. Akers, who is dead, but who

was one of the commissioners appointed to sell said slaves and to whom said bond was executed. He avers further that he assigned Madison a bond which he held on Giles M. Thompson, dated August 25, 1858, and payable on demand, for $371, in payment of his interest in the negro bond, and in proof of this fact he exhibits with his answer the said bond of Thompson for that amount, on which interest is calculated by one James C Mullins, since dead, from August 25, 1858, to January 1, 1859, the very date of the credit to himself on the bond executed by him for the negro money. And he avers further, what is perfectly manifest, that if the interest of the said Madison was a credit upon his land purchase, which he denies, that then Madison had overpaid him for the land, by a large amount; and that he must have made heavy payments thereon at a time when he must have known that he was paying money not due.

At the hearing, on the eighth December, 1884, the injunction was dissolved, when the appellant filed another bill and procured from the judge of the corporation court of Danville another injunction restraining the plaintiffs in the original suit and commissioner of sale appointed in that suit from making sale of the said land or otherwise proceeding to execute the decree of May 16, 1884, entered in that cause. In this last-mentioned bill, which the appellant in his petition calls a bill in the nature of an application for a rehearing of the original suit, the appellant alleges as one of the grounds for a rehearing this last mentioned decree that he is possessed of newly-discovered evidence. On the fourth July, 1885, this second injunction was dissolved, thus leaving the aforesaid decree of May 16, 1884, again in force, whereupon the appellant appealed from the order of dissolution.

Now, from the foregoing recital of the pleadings and proceedings in the cause, it will be readily seen that never

prior to the decree of May 16, 1884, did the appellant deny that there was existing indebtedness from him to Nathaniel S. Akers on account of the unpaid balance of land money. On the contrary, he not only admitted a liability on this account in both his deposition and answer, but he himself furnished an itemized statement, which he asserted showed the exact amount of that indebtedness. Indeed, his grievance prior to that decree seemed to have been that he was not permitted to settle the whole matter by the payment of the $78.71, which he admitted he owed Nathaniel S. Akers, and so put an end to the litigation. Now this was the appellant's defence, deliberately made and energetically pressed up to the time when the decree of May 16, 1884, disclosed the fact that, after allowing him every credit that he could establish, he was still indebted to the appellee in the sum of $611, whereupon he immediately changed front, and insists with equal pertinacity that he had allowed his brother, N. S. Akers, to retain his share—that is, $370—of "the negro money" as a credit upon the $800 he was to pay for the land.

Now, without stopping to comment upon the improbability of the suggestion that in making up a carefully prepared statement, under the eye of experienced counsel, to exhibit the true state of the account between himself and his brother, both he and his counsel would have overlooked so large a credit as $370—nearly one-half of the entire purchase-money—while carefully remembering and preferring such trifling items as $3.64, $4.23, and $4.50, we think it perfectly apparent that the claim, however honestly asserted it may have been, has no real foundation. For in the first place he became, as the record shows, entitled to the $370 at and before the period at which he purchased the land; if, therefore, that amount had still been due at the time of that purchase, the purchase-money to be paid would have been only $430, and the terms of the pur-

chase would in all reasonable probability have been that he should pay $30 in cash, and the balance at twelve months, or one-half of that amount ($430) in cash, and the balance at twelve months. Again, it is perfectly clear in our judgment, from an examination of the record, that the appellant received in payment of this $370 the bond of one Giles M. Thompson for $371 more than a month before the contract of purchase was entered into, and subsequently collected it. And there is nothing in the evidence of the after-discovered witnesses at variance with this view, for giving to it its fullest scope that can be attributed to it does not necessarily exclude the idea that Madison J. Akers had been paid his share of the slave money in the bond of Thompson, and should not produce a different result on another hearing. The decree appealed from is right, and must be affirmed.

DECREE AFFIRMED.